

# The Attorney General of Texas

November 9, 1983

JIM MATTOX
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

'01 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. Lyndon L. Olson, Jr.
Chairman
State Board of Insurance
1110 San Jacinto Boulevard
Austin, Texas    78711

Opinion No. JM-88

Re:  Whether article 3.68 of
the Insurance Code applies to
non-Texas business of a life
insurance company holding a
Texas certificate of authority

Dear Mr. Olson:

You have requested our opinion concerning the scope of article
3.68 of the Insurance Code.  Specifically, you ask whether the article
requires your agency to revoke the Mid-South Life Insurance Company's
certificate of authority to transact business in Texas.  Article 3.68
of the Texas Insurance Code provides as follows:

Art. 3.68.  No Commissions Paid Officers

No life insurance company transacting business
in this State shall pay, or contract to pay,
directly or indirectly, to its president, vice
president, secretary, treasurer . . . or to any
officer of the company other than an agent or
solicitor, any commission or other compensation
contingent upon the writing or procuring of any
policy of insurance in such company, or procuring
an application therefor by any person whomsoever,
or contingent upon the payment of any renewal
premium, or upon the assumption of any life
insurance risk by such company.  Should any
company violate any provision of this article, it
shall be the duty of the Board of Insurance
Commissioners to revoke its certificate of
authority to transact business in this State.

Mid-South Life Insurance Company (hereinafter "insurance
company"), a Mississippi insurer, holds a certificate of authority to
write life, health, and accident insurance in Texas.  The insurance
company owns 100% of the voting securities of MS Services, Inc.
(hereinafter "service company"), a Mississippi corporation.  The
president and secretary of the two companies are the same.

The insurance company and the service company entered into a service agreement in 1981, whereby the service company would provide sales promotion services, clerical help, office space, office equipment, and other equipment, facilities, and support services for the insurance company. The agreement provided that the insurance company would pay the service company a fee based on the amount of annual net premiums written.

The first question to be addressed is whether the payment of compensation under the terms of the 1981 agreement would violate article 3.68 if paid for the Texas business of the companies. The payment to an officer of the insurance company of any commission or other compensation contingent upon the procuring of any policy of insurance would violate the statute. The 1981 agreement provides for the payment by the insurance company of a fee based on the number of premiums written; this fee is thus contingent upon the procuring of insurance policies.

The statute forbids the payment by an insurance company to "its" officers, directly or indirectly, of a commission. Although the 1981 agreement is between two corporations, it does contemplate the indirect payment by the insurance company to "its" officers of such a commission. The service company is a wholly owned subsidiary of the insurance company. The president and secretary of the service company are also president and secretary, respectively, of the insurance company. When the insurance company pays the service company a commission under the 1981 service agreement, it is indirectly paying the officers of the service company. Because the officers of the two companies are the same, they would be receiving the indirect benefits of the commission payments through their salaries or otherwise.

There are several policy reasons for this interpretation of the scope of article 3.68. First, if a life insurance company could pay commissions to a subsidiary company whose officers were the same as the insurance company's, then the intent of the statute could easily be thwarted by merely setting up "dummy" corporations when commissions were desired. Second, this type of arrangement could be used to channel funds from the insurance company to the subsidiary, eventually leading to insolvency on the part of the insurance company and a subsequent inability to fulfill its obligations to policyholders. Finally, if one of the purposes of the statute is to prevent the promotion or condoning of unscrupulous selling techniques, then it is necessary to apply the statute to this agreement, because the service company rather than the insurance company will be providing all sales promotion services.

Statutes regarding insurance should be liberally construed in favor of the public and the insured. Johnson v. Prudential Insurance Co. of America, 519 S.W.2d 111 (Tex. 1975). For the foregoing reasons, it is our opinion that the 1981 agreement does violate the statute.

The two companies entered into another service agreement in 1982 which "applies only to services in connection with Texas Business." The agreement provides that the insurance company would pay the service company a fee after the commencement of business in Texas, but does not specify on what basis the compensation will be paid. According to the director of the legal staff of the Commissioner of the State Board of Insurance, the 1982 agreement was intended to provide that no commission would be paid based on the procurement of policies in Texas, as opposed to other states. We now consider whether the 1982 agreement violates article 3.68.

No direct authority could be found in response to this question other than an Attorney General Opinion, unnumbered (1926), Book 281, page 106, interpreting the predecessor to article 3.68. This opinion provides in pertinent part as follows:

> I have your letter of recent date in which you ask for the opinion of this Department upon the legality of the practice indulged in by a life insurance company organized under the laws of Kansas whereby it pays to an officer commissions upon life insurance business written by the company but in which there is a specific waiver of any right to any part of the commission derived from business written in Texas . . . .

> It will be noted that [the predecessor to article 3.68] does not confine the restrictions to companies doing business under a charter granted by the State of Texas but every company which transacts business in this state is prohibited in the most general terms from paying commission to its president and other executive officers upon life insurance policies written by it. We think that if any company transacting business in this state, no matter where organized, shall violate the provisions of this article, it is your duty to cancel its certificate of authority.

Under this interpretation of the predecessor of article 3.68 by this office, the 1982 agreement would violate the statute.

An analogous case to the instant situation is State v. State Mutual Life Assurance Co. of America, 353 S.W.2d 412 (Tex. 1962). State Mutual was a Massachusetts corporation with its home office in Massachusetts. It held a certificate of authority to do business in Texas, and sold life, health, and accident insurance and annuities in this state. The National Association of Securities Dealers (hereinafter NASD) was incorporated under the laws of Delaware. It had offices in Delaware and Washington, D.C., with member firms all across the country, including many member firms in Texas.

NASD instituted an insurance trust for the purpose of establishing a plan of group insurance for its member firms and their employees. Applications for group insurance were mailed from NASD's office in Delaware to State Mutual's office in Massachusetts, which in turn issued and mailed group policies to Delaware, including policies for twenty-five Texas member firms of NASD. The group policies were valid under the laws of Massachusetts and Delaware. They would not have been valid in Texas had they been executed and delivered in Texas, because article 3.50, section 3 of the Insurance Code did not authorize group insurance for members of a trade association. That statute provided in pertinent part as follows:

> [I]t shall be unlawful to make a contract of life insurance covering a group in this state, and the license to do business in Texas of any company making a contract of life insurance covering a group in this state except as may be provided in this Article may be forfeited by a suit brought for that purpose . . . .

The court stated that the "plain and unambiguous language" of the statute prohibited the coverage of trade association groups in Texas by contracts of insurance executed and delivered in states where this type of group insurance was legal. The court next noted that to hold otherwise would "destroy the effectiveness of article 3.50 and . . . make a mockery of its purpose and intent." Finally, the court held that the statute "authorizes cancellation of the license to do business in Texas of any company which executes and delivers anywhere a contract of insurance covering an unauthorized group in Texas, irrespective of the validity of the contract where executed and delivered." Id. at 414-15.

As in the State Mutual case, the plain and unambiguous language of the statute at issue here mandates an even-handed application of the prohibition against commissions to officers on both out-of-state and in-state business. Article 3.68 applies to any life insurance company transacting business in this state and forbids "any commission or other compensation contingent upon the writing or procuring of any commission or other compensation contingent upon the writing or procuring of any policy of insurance in such company." (Emphasis added). The legislature made no distinction between foreign companies and domestic companies or between commissions made on Texas policies and foreign policies, although it makes such distinctions in other code provisions. See, e.g., Tex. Ins. Code arts. 3.12 and 21.43.

Furthermore, public policy and legislative intent appear to require equal application to commissions on both domestic and foreign policies. Article 1.14-1 of the Insurance Code provides in pertinent part:

> The Legislature declares that it is . . . concerned with the protection of residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets . . . by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state.

Article 3.24-1 provides as follows:

> When a foreign or alien company has complied with the requirements of this Subchapter and all other requirements imposed on such company by law and has paid any deposit imposed by law, and the operational history of the company when reviewed in conjunction with its loss experience, the kinds and nature of risks insured, the financial condition of the company and its ownership, its proposed method of operation, its affiliations, its investments, any contracts leading to contingent liability or agreements in respect to guaranty and surety, other than insurance, and the ratio of total annual premium and net investment income to commission expenses, general insurance expenses, policy benefits paid and required policy reserve increases, <u>indicates a condition such that the expanded operation of the company in this State or <u>its operations outside this State will not create a condition which might be hazardous to its policyholders, creditors or the general public</u>, the Commissioner shall file in the office the documents delivered to him and shall issue to the company a certificate of authority to transact in this State the kind or kinds of business specified therein. Such certificate shall continue in full force and effect upon the condition that the company shall continue to comply with the laws of this State. (Emphasis added).

Thus, the legislature has indicated that it is concerned with operations of a company outside Texas as well as within Texas, if those operations may have an effect on Texas policyholders, creditors or the general public.

Commissions paid to officers of an insurance company, even if restricted to out-of-state business, would have a potentially

hazardous effect on policyholders, creditors, or the general public in Texas. Company officers set company policy governing attempts to sell life insurance policies to the public. If officers receive commissions based on the number of policies written, they may advocate unscrupulous selling techniques or ignore malfeasance by insurance agents so that their income will not be affected. This situation would affect all policyholders, whether located in Texas or not. Furthermore, in our opinion, one purpose of the statute is to prevent overselling of insurance policies, which would impair the financial well-being of the company. If policies were oversold in other states, even if not in Texas, the overall financial well-being of the company would be affected. Insolvency of the company would certainly affect Texas policyholders and the Texas public as well as the policyholders and public in those states where commissions are allowed.

Another compelling reason for applying article 3.68 to this arrangement between the insurance company and the service company is that to fail to do so would discriminate unfairly against domestic insurers in favor of foreign insurers. A domestic life insurance company that also did business in other states would be in violation of article 3.68 if it gave its officers commissions on its out-of-state business. There is no rational reason to treat foreign insurers differently.

Under this interpretation of article 3.68, Texas is not seeking to prohibit a contractual arrangement made between the insurance company and the service company in another state. "It seeks only to take away from a foreign insurance corporation what is finally and essentially a privilege," which is the ability to do the business of insurance in this state. Texas does not deny full faith and credit to the laws of the state where the contract was made by denying the insurer the right to do business in Texas if the contract would be unlawful if made in this state. State v. State Mutual Life Assurance Co. of America, supra, at 419.

This application of article 3.68 does not violate the Commerce Clause, because Congress removed all Commerce Clause limitations on the authority of the states to regulate the business of insurance when it passed the McCarran-Ferguson Act, 15 U.S.C. section 1011, et seq. Western and Southern Life Insurance Company v. State Board of Equalization of California, 451 U.S. 648, 653 (1981). Furthermore, the Privileges and Immunities Clause is inapplicable to corporations. Id. at 656.

Finally, this application of article 3.68 does not deny the insurer due process of law. A statute denies substantive due process rights if it does not bear a rational relation to a legitimate state purpose. Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124 (1978). The courts will assume that the objectives articulated by the legislature are the actual purposes of the statute. Minnesota v. Clover Leaf Creamery Company, 449 U.S. 456, 463 n.7 (1981).

The test for determining the validity of an application of a statute such as the one at hand is whether the state is regulating the business of insurance within the state, or is reaching beyond its borders to regulate a subject which was not of its legitimate concern. Osborn v. Ozlin, 310 U.S. 53, 62-67 (1940). In the Osborn case, the Court held that a Virginia statute prohibiting the writing of insurance on risks within Virginia except through resident agents was constitutional under the Fourteenth Amendment. In Hoopeston Canning Company v. Cullen, 318 U.S. 313 (1943), the Court upheld the constitutionality of New York's practice requiring an Illinois company to subject its Illinois contracts to New York regulations when insuring New York risks. As in the instant case, these laws and regulations reached beyond the border of the state where a license was sought, and actually controlled the financial and other internal systems of the company in its home state and other states. The Supreme Court held that this scope of authority was constitutional. Id. at 320-21.

In State v. State Mutual Life Assurance Company of America, supra, at 416, the court held that a state may condition the right of a foreign corporation to do business in the state on compliance with all reasonable regulations. The application of article 3.68 to the insurance company for payment of commissions on out-of-state business bears a rational relation to legitimate state purposes, including the protection of Texas policyholders.

## S U M M A R Y

The arrangement by which a life insurance company pays a fee to a subsidiary which has the same president and secretary as the insurance company based on the number of policies sold would violate article 3.68 of the Texas Insurance Code. Even if the arrangement were made between two foreign companies, and no commissions were paid on Texas business, the payment of commissions based on out-of-state business would violate article 3.68.

Very truly yours

JIM MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

Prepared by Margaret McGloin
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Jon Bible
Susan Garrison
Margaret McGloin
Jim Moellinger
Nancy Sutton