488 So.2d 658 (1986)
SEVILLE FINANCIAL, INC., Appellant,
v.
NATIONWIDE MARKETING ASSOCIATES, INC., Appellee.
No. 84-2576.
District Court of Appeal of Florida, Fourth District.
May 21, 1986.
Louise H. McMurray, Miami, for appellant.
Charles M. Daniels of Daniels, Butman & Pomerantz, Fort Lauderdale, for appellee.
*659 GLICKSTEIN, Judge.
This is an appeal of a non-final order, finding appellant subject to in personam jurisdiction under the Florida Long-Arm Statute.[1] We reverse.
Shere Griggs, a representative of Seville, first had contact with Nationwide on behalf of Seville in October of 1983. That contact occurred at a convention in Texas where a representative of Nationwide was distributing literature on behalf of Nationwide. Ms. Griggs met with that Nationwide representative and was told to call the phone number printed on the handout.
In January of 1984 she called that number, spoke with Roger Ballenger, and requested Nationwide's services in securing a lender to participate in Seville's home improvement loan program, agreeing to pay Nationwide one-half of one percent of the loan commitment. Mr. Ballenger's affidavit recites that it was agreed that the commission was to be paid at Nationwide's office in Florida; that in January Nationwide did in fact procure a commitment on behalf of Seville from Delta Savings and Loan, and that Seville refused to pay the agreed commission. Attached to his affidavit were copies of two letters that Seville had sent to Nationwide objecting to paying the full commission.[2]
Accordingly, viewing the jurisdictional facts in the light favorable to appellee, the complaint and the remainder of the record reveals that the only contacts appellant has with Florida are as follows:
(1) Appellant's employee, Shere Griggs allegedly called a representative of appellee in Florida and made an oral agreement with him.
(2) The parties allegedly agreed that the amount due under this agreement was to be paid in Florida.
(3) Appellant wrote several letters to appellee's business in Florida regarding the amount due under the agreement.
There is no allegation that appellant solicits or conducts business in this state.
In its brief appellee simply argues that section 48.193(1)(g) Florida Statutes (1983), of the long-arm statute is met; therefore Florida has jurisdiction. Section 48.193(1)(g) states:
(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
... .
(g) Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.
However, the issue is whether the trial court's jurisdiction over the person of Seville *660 offends due process. We conclude that it does.
Prior to the action of the trial court in this case, this court rendered its decision in Scordilis v. Drobnicki, 443 So.2d 411 (Fla. 4th DCA 1984). There, the plaintiff mother-in-law, while living in New York, lent money to her son-in-law pursuant to oral agreements which did not specify a location for repayment. The mother-in-law then moved to Florida and later sued for repayment of the loans. In deciding the issue of in personam jurisdiction, this court stated:
The mother-in-law's theory of jurisdiction involves a two-step analysis. First, relying on general contract law, she asserts that in a suit on a contract, the cause of action arises where the breach occurs; and, if the contract does not expressly provide for a place of payment, it is implied that payment is to be made at the residence of the creditor. See, e.g., Crescent Beach, Inc. v. Jarvis 435 So.2d 396 (Fla. 5th DCA 1983). Second, she employs section 48.193(1)(g), Florida Statutes (1981), which provides that a person is subject to Florida's jurisdiction if that person "[b]reaches a contract in this state by failing to perform acts required by the contract to be performed in this state."
Admittedly, if the general principles of contract law can be applied so as to find a breach of the contract in Florida, then a literal reading of the statute would suggest that Florida has jurisdiction over the son-in-law. But, in our view, such an application of the statute would not pass constitutional muster. Our sister court articulated the same concern in Osborn v. University Society, Inc. 378 So.2d 873 (Fla. 2d DCA 1979):
[I]n cases involving jurisdiction over non-residents, there are constitutional issues which we must also consider. A court may acquire personal jurisdiction over a nonresident only if the nonresident has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945). Thus, under a given factual situation, even though a non-resident may appear to fall within the wording of a long arm statute, a plaintiff may not constitutionally apply the statute to obtain jurisdiction in the absence of the requisite minimum contacts with the forum state.

Id. at 874 (citations omitted).
443 So.2d at 412-13.
Dinsmore v. Martin Blumenthal Associates, Inc., 314 So.2d 561, 567 (Fla. 1975), involved a different portion of the long-arm statute, but part of its holding is certainly applicable to the present case:
A long-arm statute is unconstitutional unless it is interpreted in a manner that requires a showing of minimal contacts sufficient to meet due process requirements. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The minumum contacts referred to are the minimum contacts of the nonresident defendant to the state wherein the plaintiff brings the action.
The trial court here did not have the benefit of Burger King Corporation v. Rudzewicz, 471 U.S. ___, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), which held:
If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, International Shoe Co. v. Washington, 326 U.S., at 319, 66 S.Ct., at 159, or on "conceptualistic ... theories of the place of contracting or of performance," Hoopeston Canning Co. v. Cullen, supra, 318 U.S. 313, at 316, 63 S.Ct. [602], at 604 [87 L.Ed. 777]. Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate *661 step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Id., at 316-317, 63 S.Ct., at 604-605. It is these factors  prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing  that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.
Id. at ___, 105 S.Ct. at 2185-86, 85 L.Ed.2d at 544-45 (emphasis in original).
Applying the principles enunciated in Rudzewicz, we find that appellant did not have sufficient minimum contacts in the present case.
DOWNEY and WALDEN, JJ., concur.
NOTES
[1] Originally, there were three issues involved. The question of in personam jurisdiction is the only remaining question following return of the case from the trial court.
[2] Ms. Griggs stated the following in her affidavit:

7. During my employment at Seville, I have not seen Seville enter into any agreement to employ a broker in the absence of a written contract.
8. After the telephone call which I made in compliance with the instructions of Nationwide's representative at the Dallas convention, Roger Ballenger made a telephone call to Seville's office in Texas from a hotel in Las Vegas, advising that a representative from Delta Savings & Loan Association was present at the time and might be interested in providing a commitment.
9. This second telephone call took place in January of 1984, and at that time no written offer or contract existed.
10. Following that telephone call, Delta Savings & Loan Association indicated that Nationwide had misrepresented the commitment that Seville had stated Seville needed in the first telephone call made to Nationwide in 1984.
11. Delta Savings & Loan Association refused to provide the commitment desired, which had been orally spelled out to Nationwide at the Dallas Convention in October of 1983.
12. Seville and Nationwide thereafter began independent negotiation for alternative funding.