**FORD MOTOR COMPANY,
et al., Plaintiffs,**

v.

**GREAT DOMAINS, INC.
et al., Defendants.**

**No. 00–CV–71544–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

March 30, 2001.

---

Kathleen A. Lang, John E.S. Scott, Dickinson, Wright, Detroit, MI, for Plaintiffs.

Mahan Consulting, Stephen Mahan, Norris, TN, Pro se.

William A. Sankbeil, Fred K. Herrmann, Kerr, Russell, Detroit, MI, Roberta Jacob-Meadway, Panitch, Schwarze, Philadelphia, PA, Eric C. Grimm, CyberBrief, Ann Arbor, MI, David H. Lowenschuss, Ann Arbor, MI, Cindy A. Cohn, San Francisco, CA, Robert R. Yoder, Phoenix, AZ, Luis M. Acosta, Plunkett & Cooney, Bloomfield Hills, MI, for Defendants.

Radtech, Wallace W. Rawson, Lansing, IL, Pro se.

UsFour, Incorporated, Khalida Farooqui, Savannah, GA, Pro se.

Suzanne Singleton, Lakewood, CO, Pro se.

### OPINION AND ORDER DENYING WITH PREJUDICE IN PART AND DENYING WITHOUT PREJUDICE IN PART DEFENDANTS RULE 12(b)(2) MOTIONS

CLELAND, District Judge.

## I. BACKGROUND

Ford Motor Company, Jaguar Cars, Ltd., Aston Martin Lagonda Ltd., and Vol-

vo Trademark Holding, AB (collectively "Ford") commenced this lawsuit against over eighty persons and entities who have registered Internet domain names that incorporate the trademarks "Ford," "Jaguar," "Aston," "Volvo," or other words in which Ford has a proprietary interest (collectively "the Ford marks"). At the time this action was commenced, the domain names were posted for sale on the Internet at GreatDomains.com, an Internet website at which domain names can be bought and sold.

Ford's complaint asserts Lanham Act claims for trademark infringement, trademark dilution, false designation of origin, and cyberpiracy against each of the named defendants. 15 U.S.C. § 1051, *et seq.* Eight of the defendants (collectively referred to as the "Registrant Defendants") have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. The matter has been fully briefed and a hearing was conducted on January 24, 2001.[1]

## II. DISCUSSION

None of the Registrant Defendants reside, or otherwise are subject to general personal jurisdiction, in the State of Michigan. Furthermore, based on the absence of relevant, physical contacts with the State of Michigan, the Registrant Defendants move to dismiss this case for lack of personal jurisdiction. Although Ford admittedly has failed to set forth any evidence of actual contacts by the Registrant Defendants with the State of Michigan, it contests the motions to dismiss on grounds that the Registrant Defendants have committed intentional torts, the effects of which have been focused in the State of Michigan. For the following reasons, the court will deny the Rule 12(b)(2) motions to dismiss for lack of jurisdiction until limited discovery in aid of deciding the motions has been conducted.

### A. Standard

■ When presented with a motion to dismiss pursuant to Rule 12(b)(2), a court has three procedural options: (1) it may decide the motion upon the affidavits alone; (2) it may permit discovery in aid of deciding the motion; or (3) it may conduct an evidentiary hearing to resolve any apparent factual questions. *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991). Although the plaintiff always bears the burden of proving that jurisdiction exists, the weight of the burden varies depending upon the procedure adopted. *Serras v. First Tenn. Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989).

■ Where a court is able to decide the motion upon the affidavits alone, a plaintiff is required to set forth only a *prima facie* case for jurisdiction to avoid dismissal. *Kerry Steel v. Paragon Indus., Inc.,* 106 F.3d at 149 (citing *Theunissen,* 935 F.2d at 1458). In such a case, the pleadings and affidavits submitted on the motion are "received in a light most favorable to the plaintiff," and, "to prevent nonresident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts," the court "does not weigh the controverting assertions of the party seeking dismissal." *Theunissen,* 935 F.2d at 1459 (citing *Serras* 875 F.2d at 1214). A court is not required, however, to "ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiff." *Kerry Steel,* 106 F.3d at 153 (citing *Market/Media Re-*

---

1. A number of other motions pending in this matter were also heard on January 24, 2001. They will be resolved in by a separate order.

*search, Inc. v. Union Tribune Pub. Co.,* 951 F.2d 102, 104 (6th Cir.1991)).

Furthermore, "[if] the written submissions raise disputed issues of fact or seem to require determinations of credibility, the court retains the power to order an evidentiary hearing and to order discovery of a scope broad enough to prepare the parties for that hearing." *Serras,* 875 F.2d at 1214. If an evidentiary hearing is conducted, the plaintiff must demonstrate the existence of personal jurisdiction by a preponderance of the evidence. *Id.* Where "the disputed jurisdictional facts are intimately intertwined with the parties' dispute on the merits" a full evidentiary hearing on the jurisdictional issue may be combined with the trial on the merits. *See id.* at 1215.

### B. Analysis

No statute of the United States directly authorizes the assertion of personal jurisdiction over the Registrant Defendants. Accordingly, the court must determine whether jurisdiction would be permitted in the courts of the forum state. *See* Fed.R.Civ.P. 4(k)(1). Jurisdiction is proper in the forum state if "the defendant [is] amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution [are] met." *Reynolds v. Int'l Amateur Athletic Fed'n,* 23 F.3d 1110, 1115 (6th Cir.1994).

### 1. Michigan Long-arm Statute

The Michigan long-arm statute authorizes the exercise of personal jurisdiction of lawsuits arising out of "[t]he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort." Mich. Comp. Laws § 600.715. The Michigan Supreme Court has held that "[a] plain language reading of these words reveals that either the tor-

tious conduct or the injury must occur in Michigan." *Green v. Wilson,* 455 Mich. 342, 565 N.W.2d 813 (1997). It is undisputed that the tortious conduct at issue in this case, *i.e.,* registering domain names that incorporate famous trademarks, did not take place in the State of Michigan. Nevertheless, misappropriating a trademark for use as a domain name causes an injury to occur where the trademark owner resides. Ford maintains its headquarters in the State of Michigan and thus is injured in Michigan when its trademarks are misappropriated by others for use as domain names. *See Neogen Corp. v. Neo Gen Screening, Inc.,* 109 F.Supp.2d 724, 727–28 (W.D.Mich.2000) (concluding that the language of the Michigan long-arm statute "likely is broad enough" to encompass a defendant's out of state activities that cause an adverse economic effect in Michigan). Thus the Michigan long-arm statute does not preclude the exercise of personal jurisdiction in this case.

### 2. Due Process Clause

Even though the Michigan long-arm statute itself permits jurisdiction, the Due Process Clause of the Fourteenth Amendment to the Constitution may limit its application. Due process considerations require that a nonresident defendant have sufficient contacts with the forum state such that the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Where, as in this case, only limited personal jurisdiction may be exercised over a nonresident defendant, the Sixth Circuit Court of Appeals has set forth three criteria to aid the court in determining whether the due process standard has been met:

First, the defendant must purposefully avail himself of the privilege of acting in

the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir.1996). Each of these factors will be considered in turn.

### a. purposeful availment

The first of these requirements—that a nonresident defendant "purposefully avail" himself of the privilege of acting in the forum state—has been called "the *sine* qua non for *in personam* jurisdiction." *CompuServe*, 89 F.3d at 1263 (quoting *Southern Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381–82 (6th Cir. 1968)). It is satisfied if the defendant himself has committed acts that "create a 'substantial connection' with the forum state," such that he "should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). It is not necessary that a defendant be physically present in the forum; rather, it is sufficient if the defendant's actions are "purposefully directed" toward the forum. *Id.* at 1264 (citing *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174). Contacts that are "random," "fortuitous," or "attenuated" may not cause a defendant to be haled into a foreign jurisdiction. *Id.* at 1263 (citing *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174).

Ford contends that the Registrant Defendants purposefully availed themselves of the privilege of acting in Michigan in two ways. First, Ford asserts that, by posting the domain names for sale on a website that is accessible to anyone on the Internet including Michigan residents, the Registrant Defendants transacted business within the State of Michigan. No evidence of actual transactions, however, has been presented. Moreover, any offers from Michigan residents or subsequent negotiations with the 12(b)(2) Defendants that might have followed would have resulted from Michigan residents reaching out to the state in which the servers that support the GreatDomains.com website are located, not from the Registrant Defendants reaching out to the State of Michigan. *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C.Cir. 2000) ("Access to a website reflects nothing more than a telephone call ... to the [website owner's] computer servers."); *Bensusan Rest. Corp. v. King*, 937 F.Supp. 295, 301 (S.D.N.Y.1996) (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1992)), *aff'd*, 126 F.3d 25 (2d Cir.1997) ("Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward the forum state."); *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336–37 (5th Cir.1999) (characterizing a website that posts information about products and provides users with a printable mail-in order form as "[no]thing more than passive advertisement which is not grounds for the exercise of personal jurisdiction"); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir.1997) ("[S]o far as we are aware, no court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state."); *GTE New Media*, 199 F.3d at 1350 ("[P]ersonal jurisdiction surely cannot be based solely on the ability ... to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants."); *Winfield Collection Ltd. v.*

*McCauley,* 105 F.Supp.2d 746 (E.D.Mich. 2000) ("[T]he function of an auction is to permit the highest bidder to purchase the property offered for sale, and the choice of that highest bidder is therefore beyond the control of the seller.") *Id.* at 749. Accordingly, the Registrant Defendants cannot be said to have purposefully availed themselves of the privilege of acting in the State of Michigan by transacting business there.

At the hearing on this matter, Ford acknowledged that it was "hard pressed" to oppose the motions to dismiss on these grounds and thus relied more heavily on its second argument that the purposeful availment prong is satisfied because the Registrant Defendants purposefully directed their alleged tortious conduct toward the State of Michigan, knowing that the injurious effects would be felt there. In support of this argument, Ford relies upon the so-called "effects" test, adopted by the Supreme Court in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

*Calder* was a libel action commenced by professional entertainer Shirley Jones against the writer and an editor of an article published in the *National Enquirer* that reported Jones had a serious drinking problem that interfered with her professional obligations. *Id.* at 784, 104 S.Ct. 1482. On the defendants' motion to dismiss for lack of personal jurisdiction, the California Court of Appeals ruled that the defendants' contacts with the state of California were insufficient to establish general personal jurisdiction. Nevertheless, the court concluded that "a valid basis for jurisdiction existed on the theory that [the defendants] intended to, and did, cause tortious injury to the [plaintiff] in California." *Id.* at 787, 104 S.Ct. 1482 (citing 138 Cal.App.3d 128, 187 Cal.Rptr. 825 (1982)). "The fact that the actions causing the effects in California were performed outside the State" was found to be of no significance. *Id.*

On appeal, the United States Supreme Court approved this "effects" test, stating:

The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

*Id.* at 788–89, 104 S.Ct. 1482.

*Calder* did not conclude that an injured plaintiff may always bring suit in his home forum but is significantly more limited in its scope. The defendants in *Calder* had "liken[ed] themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California," arguing that "[c]ases which hold that jurisdiction will be proper over the manufacturer should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant state." *Calder,* 465 U.S. at 789, 104 S.Ct. 1482. Thus, the defendants argued that while their publisher or distributor might be susceptible to jurisdiction in California for the libelous article, they should not be.

█ The defendants' analogy "d[id] not wash" for several reasons. First, the Court noted that the defendants were not charged with "mere untargeted negligence," but intentional actions, "expressly

aimed" at California. *Id.* at 789, 104 S.Ct. 1482. Second, the court noted that the defendants knew the brunt of the injury would be felt by the plaintiff in her home forum. *Id.* at 789–90, 104 S.Ct. 1482. It was specific reliance upon these circumstances that led the Court to conclude the defendants "must 'reasonably anticipate being haled into court [in California]' to answer for the truth of the statements made in their article." *Id.* at 790, 104 S.Ct. 1482. Thus, to satisfy the "effects" test in this case, Ford must demonstrate (1) that the brunt of the injury was felt in Michigan, (2) that the Registrant Defendants use of the Ford Marks was intentional or deliberate, and (3) that the Registrant Defendant's acts were expressly aimed at the State of Michigan.

### (i) intentional acts

 The court takes notice of the fact that the Ford marks at issue in the pending motions—"Volvo," "Jaguar," "Stang," "Ford," "Lincoln," and "Mercury"—are well known throughout the United States and England (where all of the Registrant Defendants live) and, indeed, throughout much of the world. The court thus finds it highly unlikely that the Registrant Defendants' incorporation of Ford's marks into the domain names they registered could have resulted from negligence. Moreover, none of the Registrant Defendants have disputed that their acts were intentional. The first element of the *Calder* effects test accordingly is satisfied.

### (ii) expressly aimed

A more difficult question is whether the Registrant Defendants' acts were "expressly aimed" at the State of Michigan. Since *Calder* was decided, numerous courts have grappled over the degree of focus on the forum state that is necessary

to satisfy the "expressly aimed" prong of the *Calder* analysis. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 261 (3d Cir. 1998) (noting a perceived split amongst the Federal Courts of Appeal). The majority of courts, however, noting that a plaintiff always feels the effects of a legal injury in his home forum, have concluded that *Calder* should be applied with caution. *Id.* Because of the Internet's function as a widely-encompassing commercial network, information resource, and social forum, application of the "effects" test to the misappropriation of protected marks as domain names raises particular difficulties.

 The nine domain names at issue in the pending motions are "vintagevolvos.com," "jaguarenthusiastsclub.com," "jaguarcenter.com," "stangstuff.com," "4fordparts.com," "4fordtrucks.com," "lincolntrucks.com," and "mercurysource.com". Ford's theory is that, by selecting famous marks to use in their domain names and then offering the domains for sale over the Internet at prices that reflect the famous nature of those marks. the Registrant Defendants essentially "assumed the risk of injuring valuable property located in [Michigan]" and thus reasonably could have anticipated being "amenable to suit there." *See Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir.1994).

 This argument is not without merit. If, for example, a person were to register the domain name "fordmotorco.com" and offer it for sale over the Internet "to any interested person," an almost irrebutable inference nonetheless could be made that the acts were targeted at Ford because no other entity or person could have a legitimate interest in that domain

name.[2]

■ On the other hand, Ford's argument is too broad; incorporating a famous mark into a domain name cannot always be deemed proof that registration of the domain name was expressly aimed at the trademark owner. An Internet search[3] of one of the marks at issue is instructive in this regard. An Internet search of the mark "Stang,"[4] for example, produces, among other things, links to jag-stang.com (a webpage dedicated to the Fender brand Jaguar, Mustang, and Jag–Stang guitars); stangnet.com (a webpage with chatrooms, classifieds, parts reviews, articles, and more, for Mustang car enthusiasts); and stangtec.com (a website providing links to over 200 websites devoted to Mustang cars, including personal webpages, chatrooms, racing sites, homepages for dealerships, resalers, aftermarket suppliers, and so forth). These uses of the Ford mark "Stang" in Internet domain names in connection with products that are completely unrelated to Ford (i.e., jag-stang.com) or to create a forum where persons with shared interests may gather (i.e., stangnet.com and stangtec.com) demonstrate the broad, legitimate uses that may be made of protected marks in domain names.[5] Indeed, even the most famous of the Ford marks, "Ford," plainly has many non-infringing uses on the net. The domain fordstheatre.org, for example, is a site for the theater in which Abraham Lincoln was killed. The domain ford-mobley.com hosts a genealogical site for mem-

**2.** This court thus disagrees with the Ninth Circuit's statement in *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.1998) that "simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another." *Id.* at 1322. Simply registering a domain name that incorporates a trademark can be a violation of the Lanham Act, if done with "bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1). Thus, registering a domain name that incorporates a trademark for which only the mark owner could have a legitimate use could be sufficient under *Calder* to support the assertion of personal jurisdiction in the mark owner's place of residence.

**3.** The Internet searches were conducted on the "Google" search engine located at http://www.google.com.

**4.** It is unclear whether "Stang" is a registered Ford trademark. Ford asserts, however, that it has used the term as a mark for many years and that, even if not registered, the mark is entitled to protection.

**5.** Analogous permissible uses of trademark names are well established in intellectual property law. *See, e.g., Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir.1969) (holding that independent mechanic who specializes in repairing Volkswagens may us "Volkswagen" mark in advertising, just not in a manner that suggests he is a part of Volkswagen's organization); *Hypertherm Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir.1987) (stating that "a firm ... which has labored (lawfully) to replicate another's parts, may ordinarily use the originator's trademark *descriptively*, that is, to identify the product it has copied, so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship, or identity of the ersatz goods"); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987) ("An imitator may use in a truthful way an originator's trademark when advertising that the imitator's product is a copy, so long as that use is not likely to create confusion in the consumer's mind as to the source of the product being sold.").

The court is mindful, however, that emphasis must be placed on the qualification that use of the mark may not create confusion in the mind of the consuming public. Because domain names are the major identifying feature of a website, if the mark itself creates confusion, mitigating information or activity on the webpage may be insufficient to demonstrate a noninfringing use. Courts have split on this issue. *See Hasbro, Inc., v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 125 (D.Mass. 1999) (citing cases).

bers of a Ford–Mobley family. Even the domain names "Ford.com" or "Ford.org" could legitimately be used to denominate such sites—for example, if registered by a person with the last name Ford.

These examples demonstrate that the registration of domain names that incorporate famous marks range across a broad spectrum from those that clearly are aimed at a mark owner to those that clearly are not, with a large gray area in between. Accordingly, the court rejects Ford's broad argument that, merely by incorporating a famous mark into a domain name, the registrant assumes the risk of being subjected to jurisdiction in the trademark owner's home forum. Concluding otherwise would shift the focus in personal jurisdiction determinations away from the "traditional [due process] notions of fair play and substantial justice," where it properly belongs, see *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154, and instead create an automatic "home-court" advantage for plaintiffs, a result not intended by *Calder*. *Accord IMO Indus.*, 155 F.3d at 262 (*"Calder* did not set forth a per se rule that the allegation of an intentional business tort alone is sufficient to confer personal jurisdiction in the forum where the plaintiff resides.").

Having rejected the standard proposed by Ford, the court must determine under what circumstances registering a trademark as an Internet domain name is "expressly aimed" at the mark owner's place of residence. No authoritative case law directly addressing this issue has been presented to, or discovered, by the court. Nevertheless, the court is guided by Supreme Court's consistent rejection of "mechanical" tests on which personal jurisdic-

tion might turn, see *Burger King*, 471 U.S. at 478, 105 S.Ct. 2174 (citing *International Shoe*, 326 U.S. at 319, 66 S.Ct. 154), and recognizes the need instead "for a 'highly realistic' approach" that looks to the "real object[ives]" of the acts in each individual case, *id.* at 479, 105 S.Ct. 2174 (quoting *Hoopeston Canning Co., v. Cullen*, 318 U.S. 313, 316–17, 63 S.Ct. 602, 87 L.Ed. 777 (1943)).

■ With these foundational considerations in mind, the court will consider two factors in determining whether registering a domain name is an act "expressly aimed" at a trademark owner: (1) the likelihood of confusion as to who controls the domain that is created by the domain name itself and (2) the level of individualized targeting at the trademark owner. These factors are inversely proportionate to each other. Thus, if the likelihood of confusion created by the domain name is high, a low-level showing of individual targeting will be required. If the likelihood of confusion is low, the level of individual targeting required will be high.

■ Two factors relevant in assessing the likelihood of confusion created by a domain name are (1) the existence of other legitimate uses for the exact mark and (2) the lexical context of the mark within the domain name.[6] Thus, for example, in addressing whether registration of a domain name that incorporates the Ford mark "Lincoln" is expressly aimed at the State of Michigan, a court would first consider uses of the word "Lincoln" that are not related to Ford Motor Company, such as the not uncommon naming of organizations after President Abraham Lincoln. Next the court would consider the other words

---

6. While the extensions ".com" (originally reserved for commercial enterprises) ".org" (associations), ".edu" (educational institutions), and so forth, are relevant to this analysis, it should be noted that their use is not always dispositive of the purposes for which the domain is used.

and phrases surrounding the mark within the domain name. Thus the domain name "lincolnnavigator.com" plainly would create a high likelihood of confusion that Ford controlled the contents of a website located at that domain. Thus, a *prima facie* case of personal jurisdiction would be established. On the next level, the names "lincoln.com" or "lincolncenter.com" would create a medium level of confusion and additional evidence of individual targeting would be required. For example, evidence that "lincolncenter.com" is the home page of New York City's Lincoln Center for the Performing Arts would defeat personal jurisdiction, while evidence that "lincoln.com" had been registered by a car dealership might lead to the contrary result. Finally, it would be highly unlikely that any amount of evidence could demonstrate that the registrant of the domain name "lincolnlogs.com" had expressly aimed its conduct at Ford in Michigan.

 Relevant considerations in assessing the level of individual targeting include (1) whether the trademark owner has been directly solicited to purchase the domain name, *see Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998); (2) whether the domain name registrant has registered domain names incorporating other protected marks, *see id.;* (3) whether the domain has been offered for sale by the current registrant and, if so, the price sought; (4) whether the registrant has a preexisting, legitimate use for the domain name; and (5) any other factors which demonstrate that the act of incorporating the protected mark into a domain name was "expressly aimed" at the forum in which the trademark owner resides.

 Applying this mode of analysis to the domain names at issue in this case, the court concludes that three of the domain names—"4fordtrucks.com," "4fordparts.com," and "lincolntrucks.com,"—in the context of their surrounding words, plainly implicate Ford as the probable source of the domain and, thus, create a high likelihood of confusion; three of the domain names—"mercurysource.com," "stangstuff.com," and "jaguarcenter.com"—create an intermediate likelihood of confusion; and three of the names—"jaguarenthusiastsclub.com." "vintagevolvos.com," and "volvoguy.com"—all create a low likelihood of confusion. Accordingly, the "expressly aimed" prong of the effects test is satisfied with respect to the domain names that create a high likelihood of confusion, while limited discovery will be permitted with respect to the remaining domains.

**(iii) brunt of injury felt in the forum**

 At least two courts have queried whether a corporation necessarily feels the brunt of an injury where its headquarters are located. In *Core–Vent, Corp. v. Nobel Indus. AB,* 11 F.3d 1482 (9th Cir.1993), the Court of Appeals for the Ninth Circuit noted that "[a] corporation does not suffer harm in a particular geographic location in the same sense that an individual does" and thus questioned "whether such harm is primarily suffered in the place where the corporation is headquartered." *Id.* at 1486. In *IMO,* the Third Circuit acknowledged that "a distinction could arguably be made," but countered that it "is questionable judicial policy to apply a different jurisdictional rule to individuals than to corporations, to small enterprises than to large ones. To indulge in such *ad hoc* determinations creates confusion where there should be certainty...." *IMO,* 155 F.3d at 265, n. 9 (quoting *Dollar Savings Bank v. First Sec. Bank of Utah,* 746 F.2d 208, 214 (3d Cir.1984)).

The Sixth Circuit's decision in *Reynolds v. Int'l Amateur Athletic Fed'n,* 23 F.3d 1110 (6th Cir.1994), is not to the contrary.

The plaintiff in that case, Harry "Butch" Reynolds, was a world-class sprinter who regularly participated in international track and field meets. *Id.* at 1112. After running at a meet held in Monte Carlo, Monaco, Reynolds was tested as part of a random drug test for illegal performance-enhancing drugs *Id.* Two of Reynold's urine samples tested positive. Subsequently, the International Amateur Athletic Federation ("IAAF") issued a press release disclosing the test results and confirming that Reynolds was banned from all international track events for two years. *Id.* Claiming that the drug test was negligently administered, Reynolds brought a libel suit against the IAAF in Ohio, seeking damages in excess of four million dollars in lost endorsement contracts and appearance fees with Ohio corporations and entities. *Id.* at 1113, 1117.

The Sixth Circuit ultimately concluded that personal jurisdiction over the defendant in Ohio was not proper. Although the court noted that Reynolds was "an international athlete whose professional reputation is not centered in Ohio," it listed numerous other factors indicating that Ohio was not the focal point of the injury. *See id.* at 1120. In view of the narrow approach taken by this court in permitting jurisdiction only upon a clear showing that the acts of cyberpiracy were aimed at Ford, the court thinks that the case for personal jurisdiction is much more compelling.

### b. arises out of

▮▮▮▮▮ Because the act of registering a domain name that incorporates a trademark gives rise to a cause of action, once it is determined that a domain name registration was "expressly aimed" at the forum state, the "arising out of" requirement is satisfied. *See Theunissen,* 935 F.2d at 1461 (applying a "but for" analysis).

### c. fair play and substantial justice

▮▮▮▮▮ Finally, where the first two elements of the test for personal jurisdiction are met, a strong inference arises that the exercise of jurisdiction is reasonable. *See CompuServe,* 89 F.3d at 1268. Thus, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. A compelling case is not made out if the defendant's concerns "may be accommodated through means short of finding jurisdiction unconstitutional," such as application of choice-of-law rules or changing venue. *Id.* The Registrant Defendants have failed to set forth any evidence that the exercise of personal jurisdiction in this matter is unreasonable or unfair.

### III. CONCLUSION

For the foregoing reasons,

IT IS ORDERED that Defendant Diamond Star Marketing, Inc.'s "Motion to Dismiss," filed July 17, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Spencer Associates' "Motion to Dismiss," filed July 17, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Thomas Cooper's "Motion to Dismiss," filed November 2, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Robert Emmert's "Motion to Dismiss," filed November 2, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Paul A. Brown's "Motion to Dis-

miss," filed November 2, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant John D. Hall's "Motion to Dismiss," filed November 2, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Thomas Cooper's "Motion to Dismiss," filed November 2, 2000, is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant RadTech's "Motion to Dismiss," filed November 2, 2000, is DENIED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Alfonso Fiero's "Motion to Dismiss," filed November 2, 2000, is DENIED WITH PREJUDICE.