**Reversed and Rendered and Opinion filed January 15, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00083-CV

---

### VINCENT PETERS, Appellant

### V.

### THE TOP GUN EXECUTIVE GROUP, Appellee

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2011-48001**

---

## O P I N I O N

Vincent Peters filed a New Jersey judgment in the trial court for domestication in Texas under the Uniform Enforcement of Foreign Judgments Act (UEFJA), TEX. CIV. PRAC. & REM. CODE ANN. §§ 35.001–008 (West 2008 & Supp. 2012). Peters appeals from the trial court's order vacating the judgment against appellee The Top Gun Executive Group. Peters contends that the trial court

abused its discretion by finding that the New Jersey court lacked subject matter jurisdiction and personal jurisdiction over Top Gun. We reverse and render that the judgment Peters filed, number VJ-005161-10, entered in the Superior Court of New Jersey Law Division, Morris County Special Civil Part, on July 6, 2010, in docket number DC-014124-09, is presently enforceable as a Texas judgment.

## BACKGROUND

Peters is a resident of New Jersey, and Top Gun is incorporated in Texas with its principal place of business in Texas. Peters and Top Gun signed a contract for Top Gun to locate employment opportunities for Peters, among other things. Peters paid Top Gun $4,500 for the service.

Peters eventually sued Top Gun in New Jersey for breach of contract, unjust enrichment, negligent misrepresentation, common law fraud, consumer fraud in violation of a New Jersey statute, and attorney's fees. Peters obtained a default judgment for $18,680.62 and filed the judgment in Texas pursuant to UEFJA. Top Gun filed a "motion to contest filing of sister state judgment and motion to vacate," which the trial court initially denied. But after an evidentiary hearing on Top Gun's motion to reconsider, the trial court signed an order vacating the New Jersey judgment. The order stated that the New Jersey court "lacked both subject matter and personal jurisdiction." Peters filed a timely notice of appeal.

## ANALYSIS

In two issues, Peters contends the trial court abused its discretion by vacating the New Jersey judgment because Top Gun failed to prove by clear and convincing evidence that (1) Top Gun lacked minimum contacts with New Jersey for purposes of specific personal jurisdiction; and (2) New Jersey's exercise of

2

specific personal jurisdiction offended due process.[1] We agree.

## I. Standard of Review for UEFJA

Full faith and credit must be given in each state to the judicial proceedings in another state. *H. Heller & Co. v. La.-Pac. Corp.*, 209 S.W.3d 844, 849 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Thus, Texas must enforce a valid judgment from another state. *Id.* When a judgment creditor, such as Peters, files an authenticated copy of a foreign judgment pursuant to UEFJA, a prima facie case for its enforcement is presented. *Id.* The burden then shifts to the judgment debtor, such as Top Gun, to prove by clear and convincing evidence that the foreign judgment should not be given full faith and credit. *Id.* A judgment debtor can meet this burden by proving that the rendering court lacked personal jurisdiction or one of several other exceptions to full faith and credit. *Id.*

We review a trial court's order vacating a foreign judgment for an abuse of discretion. *Mindis Metals, Inc. v. Oilfield Motor & Control*, 132 S.W.3d 477, 486 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Whether a judgment debtor can prove that the foreign court lacked jurisdiction generally involves a factual inquiry. *See id.* (citing *Reading & Bates Const. Co. v. Baker Energy Res. Corp.*, 976 S.W.2d 702, 713 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)). When addressing personal jurisdiction in the context of a special appearance, we have

---

[1] Under his first issue, Peters also argues that the trial court abused its discretion by finding that Top Gun proved by clear and convincing evidence that the New Jersey court lacked subject matter jurisdiction. Top Gun does not respond to this argument on appeal, and the record does not reveal that Top Gun asked the trial court to vacate the judgment due to a lack of subject matter jurisdiction in the New Jersey court. Further, we conclude the record contains no evidence that the New Jersey court lacked subject matter jurisdiction, and the trial court abused its discretion in so finding.

Peters also appears to urge an issue not identified in his statement of issues: we should reinstate the New Jersey judgment because "equity calls for it." Because we sustain Peters's first two issues, we do not reach the "equity" issue. *See* TEX. R. APP. P. 47.1.

recognized that trial courts frequently must resolve fact questions. *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 277 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)). And if the trial court does not sign findings of fact and conclusions of law, all facts supported by the evidence and necessary to the trial court's ruling are implied in favor of the trial court's ruling. *Id.* Implied findings may be challenged on sufficiency grounds. *Id.* When the standard of proof is clear and convincing evidence, as here, we must review the evidence in the light most favorable to the trial court's finding to determine "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (parental termination). We will disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but generally we do not disregard undisputed facts. *Id.*

Further, a trial court has no discretion in applying the law to established facts. *Mindis Metals*, 132 S.W.3d at 486. "Personal jurisdiction is a question of law for the court, even if it requires resolving questions of fact." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005); *see also Boyes v. Morris Polich & Purdy, LLP*, 169 S.W.3d 448, 456 (Tex. App.—El Paso 2005, no pet.) (holding that a Nevada trial court had personal jurisdiction over the judgment debtor as a matter of law).

## II. Controlling Authority for Personal Jurisdiction Exception under UEFJA

Initially, we note that Peters and Top Gun disagree over which state's precedent should guide our resolution of the personal jurisdiction inquiry. Peters argues that we should look to New Jersey case law while Top Gun argues that Texas and federal decisions control the inquiry.

4

To determine the validity of a foreign state's judgment, we look to the laws of the state that rendered the judgment. *H. Heller & Co.*, 209 S.W.3d at 849. However, when a state's long-arm statute extends to the limits of due process under the United States Constitution—as in Texas[2] and New Jersey[3]—we are not limited to considering precedent from the forum state. *See id.* at 849, 851 n.1 (considering federal, Texas, and Alabama precedent in appeal concerning an Alabama judgment when the Alabama long-arm statute extended to the limits of due process under the United States Constitution); *see also BMC Software*, 83 S.W.3d at 795 (relying on "precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions," to resolve special appearance).

Accordingly, we rely on federal, Texas, and New Jersey precedent. *See H. Heller & Co.*, 209 S.W.3d at 851 n.1. "The general principles are the same, and we find that there would be no difference in outcome depending on which state's precedent is controlling." *Id.*

## III. Personal Jurisdiction

Peters and Top Gun agree that the central issue is whether the New Jersey court had specific personal jurisdiction over Top Gun. We begin by reviewing the principles of personal jurisdiction. Then we present the jurisdictional evidence in light of the standard of review. Finally, we conclude that the trial court erred because Top Gun failed to prove by clear and convincing evidence that the New Jersey court lacked personal jurisdiction.

---

[2] *See BMC Software*, 83 S.W.3d at 795.

[3] *See Charles Gendler & Co. v. Telecom Equip. Corp.*, 508 A.2d 1127, 1131 (N.J. 1986).

### A.    Principles of Personal Jurisdiction

"Under constitutional due-process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quotation omitted); *accord Lebel v. Everglades Marina, Inc.*, 558 A.2d 1252, 1254 (N.J. 1989).

### 1.    Minimum Contacts

"A defendant establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco*, 278 S.W.3d at 338 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The defendant's conduct and connections with the forum state—whether consisting of direct acts within the forum or conduct outside the forum—must justify a conclusion that the defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Retamco*, 278 S.W.3d at 338.

"General" jurisdiction arises when a defendant's contacts with the forum state are "continuous and systematic." *Retamco*, 278 S.W.3d at 338. "Specific" jurisdiction arises when the defendant's contacts with the forum show that "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Id.* "In a specific jurisdiction analysis, we focus on the relationship among the defendant, the forum, and the litigation." *Id.* (alterations and quotation omitted).

6

To determine whether a defendant's contacts with a forum show purposeful availment, we consider three principles: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party; (2) the contacts must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the forum. *Id.* at 338–39 (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007)).

When the litigation concerns a contract between the parties, the mere fact that the parties signed a contract does not automatically establish sufficient minimum contacts in the other party's home forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985); *Michiana*, 168 S.W.3d at 786. "[A] 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316–17 (1943)). In contract disputes, we must consider the parties' prior negotiations, the contemplated future consequences, the terms of the contract, and the actual course of dealing of the parties. *See id.*

Jurisdiction "may not be avoided merely because the defendant did not physically enter the forum state." *Id.* at 476 (emphasis omitted). Parties who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Michiana*, 168 S.W.3d at 785 (quoting *Burger King*, 471 U.S. at 473).

"[I]t is not the number, but rather the quality and nature of the nonresident defendant's contacts with the forum state that is important." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 230 n.11

7

(Tex. 1991); *accord Peredo v. M. Holland Co.*, 310 S.W.3d 468, 472 (Tex. App.— Houston [14th Dist.] 2010, no pet.). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see also Michiana*, 168 S.W.3d at 787 ("[A] single contract may meet the purposeful-availment standard . . . . (emphasis omitted)).

### 2.    Traditional Notions of Fair Play and Substantial Justice

When the minimum contacts test is satisfied, "it is incumbent upon the defendant to present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Guardian Royal*, 815 S.W.2d at 231 (quoting *Burger King*, 471 U.S. at 477). "'Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.'" *Retamco*, 278 S.W.3d at 341 (quoting *Guardian Royal*, 815 S.W.2d at 231). "Nonetheless, we still consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies." *Id.*

### B.    Jurisdictional Evidence

The trial court held an evidentiary hearing at which the court heard live testimony from a single witness: Top Gun's owner Craig Chrest. The court also admitted the following exhibits: (1) an affidavit from Chrest; (2) an affidavit from Peters; (3) an email from Top Gun to Peters sent on September 5, 2008; (4) the "services agreement" between the parties dated September 9, 2008; (5) an email

from Top Gun to Peters sent on April 1, 2009; and (6) Peters's resume.

We will review the undisputed and conflicting evidence separately to give appropriate deference to the trial court's implied findings.

### 1. Undisputed Evidence

Chrest testified that Top Gun was an executive recruiting firm with offices in Houston, Texas. Top Gun had no branch offices, no office in New Jersey, and no property in New Jersey. Top Gun never had "any type of advertisement specific to the State of New Jersey," and Top Gun performed all of its work from its Houston office. Top Gun had a website that allowed prospective clients to contact the company though email.

Peters testified by affidavit that in 2008 he was searching for a job, and he posted his resume on several job websites. On September 5, 2008, Top Gun sent an email to Peters at the email address appearing on Peters's resume. The email addressed Peters as "Vincent," and began as follows: "After reading the following, you make the decision as to whether or not we talk later. Based on a brief description I read about your background on your resume, there's a possibility we may be able to help you with your job search." The email described Top Gun's history and experience and listed the services it would provide, such as "uncover real positions that match your skills, identify the actual decision maker for the position, not HR, and provide extensive research on the company that is utilized to differentiate you from the many thousands of candidates competing for the same position." The email explained that Top Gun "work[s] one on one with our clients advising and mentoring at every step of the way while contacting real decision makers who are actually hiring."

The email repeated several times that its success rate with clients was 100%, and Top Gun "never failed to identify and reach the proper hiring authority—never!" The email described Top Gun's fee as two parts: (1) a small retainer to fund the job search; and (2) a flat fee due "only when you secure employment as a result of our efforts." The body of the email concluded with the following: "You can take comfort in knowing that we never enter an engagement unless we know we can help. Call me anytime (281-517-0303) or send me an e-mail including the best time and number to call you." The signature block indicated the email was from "Erin Valdez, Administrative Marketing" at Top Gun. After the signature block, the email advised, "If you prefer not to receive information about this service, please reply Unsubscribe in the subject line."[4]

Chrest testified that the September 5, 2008 email was "a follow-up e-mail we send to people that forward their resume" to Top Gun. Chrest testified by affidavit that the email was "a form email response sent to anyone making an inquiry for information" from Top Gun. In 2008, Top Gun received approximately 500 to 1,000 resumes per day.

Peters testified by affidavit that after he had read the email and reviewed Top Gun's website, he called Top Gun at the phone number provided in the email. Chrest testified that he sent a services agreement to Peters in New Jersey and that Peters returned the signed contract from New Jersey. Chrest also acknowledged that Peters's resume included a New Jersey address and phone number with a New Jersey area code.[5]

The services agreement admitted into evidence states that Top Gun would do

---

[4] After Peters sued Top Gun, Peters received an identical email from Top Gun on April 1, 2009.

[5] Further, all of the prior jobs listed on Peters's resume—dating back to 1979—were located in New Jersey or New York City.

the following for Peters:

1. Identify the hiring manager/s responsible for the position or positions in pursuit.

2. Present the hiring manager with the Qualification Match completed by Client.

3. Notify Client when a match occurs and schedule the interview with the hiring manager only after gaining concurrence from Client.

4. Work closely with Client throughout the entire process providing assistance for making a successful placement possible.

5. Provide weekly updates summarizing all recruiting and placement activities on Client's behalf.

6. Continue to provide all services above until Client is successfully placed; or, until such time this Agreement is deemed null and void.

7. We will perform clients [sic] job search including the open job board and retained recruiting network.

8. Make phone calls and emails to hiring managers and recruiters.

9. Prepare Client for all interviews including personal network and our network.

10. Provide Client with executive coaching.

Peters agreed to pay a non-refundable retainer of $4,500 and an additional fee of $5,000 upon acceptance of employment with a company referred by Top Gun. Payment of the $5,000 fee could be deferred for three years and forgiven in $1,000 increments for each referral Peters made to Top Gun that resulted in a new client or job opening for Top Gun.

The services agreement also stated that the agreement could be canceled if either party failed to perform as agreed. In particular, the agreement included the following term: "If [Top Gun] fails to present at least 4 positions deemed suitable

11

by Client within the first 6 months of this agreement, Client may terminate this agreement and no further fees will accrue." The agreement also included a "guarantee" from Top Gun: "We will work with you every step of the way and make ourselves available via telephone and email with a guaranteed response time of no more than 24 hours." Peters paid the $4,500 retainer by completing a credit card form provided by Top Gun. The billing address for the payment was in New Jersey.

Finally, Chrest testified that Top Gun identified twenty-eight employment opportunities for Peters located in various states throughout the country. One of the opportunities was for a job in New Jersey. Chrest acknowledged that "one of the states that [Peters] wanted a job was in New Jersey."

### 2. Conflicting Evidence

The parties dispute two factual matters: (1) whether the subject matter of the contract was limited to finding employment opportunities in New Jersey and New York; and (2) who initiated contact.

Regarding the subject matter of the contract, Peters testified that he informed Top Gun during a telephone conversation that he was "searching for a job in my state or in New York." He testified that Top Gun told him that he would be "provided job placement opportunities within those two states." Peters alleged that Top Gun promised that it would find him "job opportunities in New Jersey or New York." On the other hand, Chrest testified that there was never "any kind of requirement on Mr. Peters' [sic] part that [Top Gun] try to find him a job in New Jersey." Chrest stated in his affidavit that Peters asked Top Gun to locate "employment opportunities throughout the United States," and Peters "did not seek to limit his search for jobs to those that might be in a particular location but rather considered opportunities presented by [Top Gun] from California to Florida." The

12

services agreement itself did not limit the job search to any particular states.

We defer to the trial court's implied resolution of this evidentiary conflict in Top Gun's favor. We disregard Peters's affidavit testimony on this subject because a reasonable fact finder could have believed Chrest and disbelieved Peters. The trial court could have formed a firm belief or conviction that Top Gun was not limited to searching for employment opportunities in New Jersey and New York.

Regarding which party initiated contact, we first reject Peters's contention that the trial court found that "Top Gun initiated the contact" by including a handwritten note on its order stating that "Defendant contacted Plaintiff in New Jersey."[6] The trial court made no express finding about who *initiated* contact. Further, we conclude that the evidence supports Top Gun's assertion that it possessed Peters's resume before sending the September 5 email. However, Chrest's testimony was self-contradictory on how Top Gun obtained Peters's resume, which bears on the "who initiated contact" issue.

First Chrest testified by affidavit that Peters "solicited the services" of Top Gun by forwarding his resume to the company, and Top Gun "responded to the solicitation of Mr. Peters by email dated September 5, 2008." Chrest testified that Top Gun did not make the first contact with Peters, and "the only way it could have happened is if [Peters] would have sent his resume to us via the fax or e-mail." However, Top Gun did not offer into evidence a copy of any such email or fax, and Chrest testified that he did not think Top Gun had a copy of any such email from Peters. Later, Chrest acknowledged that Top Gun could have received Peters's resume through "resume blasters things . . . Probably there or from a referral from somebody or—there is a variety of ways that people reach out to us."

---

[6] The full note stated, "Although Defendant contacted Plaintiff in New Jersey, in doing so Defendant did not seek a benefit, advantage, or profit by availing itself of the forum."

13

Chrest also testified that Top Gun could have obtained Peters's resume if Peters had uploaded his resume to a website such as Monster.com[7] and Top Gun "had a job posting up there."

Eventually the trial court questioned Chrest directly, and Chrest was only able to "guess" how Top Gun obtained Peters's resume. The following exchange occurred:

THE COURT: Does your company mainly represent employers or employees?

THE WITNESS: Employers.

THE COURT: All right. So when they would come and ask you to fill a position, do you go about that by putting a posting on places like Monster and other spots like that?

THE WITNESS: We don't. We hire—we—that is a way to do it. But our—the technique that we use is a little bit different. We source them, so we would hire a sourcer. If we got a job, let's say, for an attorney, a corporate attorney in food and beverage, we would hire a sourcer and they would get us names of that individual and companies that were similar and then we'd start recruiting calls to them.

THE COURT: All right. So there's a middleman between you and the prospect?

THE WITNESS: Correct.

THE COURT: That middleman may have posted on Monster or other places?

THE WITNESS: Oh, yeah.

THE COURT: I'm trying to figure out how this guy would have found you. So if that's what your sourcer did, then it's possible that he responded to Ad Number 1 and it was brought to you and you sent him the first e-mail?

THE WITNESS: Could be.

---

[7] Monster.com is a website for job seekers and employers to connect through advertisements posted by employers or resumes uploaded by job seekers to a database that is searchable by employers (among other services).

THE COURT: He may have responded to Ad Number 2 completely separately, not knowing that the resume was going to come to you eventually. That's why it would have come to you in Number 2?

THE WITNESS: Could be.

                *              *              *

THE COURT: Is there anything you know from your own personal knowledge—don't speculate—as to how it was that he found you guys?

THE WITNESS: I could take a number of guesses is that—

THE COURT: I don't want you to guess. I want to know if there is anything from what you and he talked about in your conversation or that your partner said that she talked about with her conversation with him.

THE WITNESS: I would—I think—my guess is that it was through the resume blasters. And these are people that say, "Hey, you want to get people that can help you, we'll send—for a hundred bucks or something like that, we'll blast your resume to all the executive recruiters in the United States." And that's one way that we get them.

Another way is we're part of a network called Top Echelon network where there are 2,400 other recruiters and there's a lot of processing and referrals that go on through there and that's a very strong possibility, without me knowing exactly how somebody out there would—

The inconsistency in Top Gun's position continues in its briefing on appeal. In its initial brief, Top Gun states, "The uncontroverted testimony at the hearing from Top Gun's owner, Craig Chrest, was that Top Gun sent an email inquiry to Peters only after receiving his resume from a third party," and, "Further, the uncontroverted evidence from Craig Chrest is that Top Gun [sent the September 5 email] in response to Peters posting his resume online." In its surreply brief, however, Top Gun points to Chrest's earlier testimony and argues there was evidence that "Peters contacted Top Gun first."

In determining whether the evidence supports a finding that "Peters contacted Top Gun first," we cannot disregard the uncontroverted evidence consisting of (1) Peters's testimony that he posted his resume on several job websites; (2) Chrest's testimony that Top Gun could have obtained Peters's resume through a third-party "resume blaster" service, the Top Echelon network, or in response to a "sourcer" placing an advertisement on an job website; (3) Chrest's testimony that Top Gun had no documentary evidence to substantiate a claim that Peters initiated contact by sending his resume directly to Top Gun; and (4) the September 5 email stating that Top Gun reviewed Peters's resume and invited Peters to call Top Gun or send his phone number and availability.

A finding can never be supported by mere conjecture, guess, or speculation. *See, e.g.*, *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *cf. Mata v. State*, 46 S.W.3d 902, 917 (Tex. Crim. App. 2001) (trial court abused its discretion by finding expert reliable when expert's testimony was inconsistent on key issues, and standard of proof was clear and convincing evidence). Considering the inconsistencies in Chrest's testimony and the remaining undisputed evidence, we conclude that no rational fact finder could have reached a firm belief or conviction that Peters initiated contact with Top Gun by sending his resume directly to Top Gun through email or fax before receiving the September 5 email from Top Gun. The evidence, however, would support the finding that Top Gun suggests in its initial responsive brief on appeal: "Top Gun sent an email inquiry to Peters only after receiving his resume from a third party," or "It was done in response to Peters posting his resume online."[8]

---

[8] Regardless, as discussed in more detail *infra*, our holding today would be the same even if the evidence supported Top Gun's assertion that Peters initiated contact by emailing or faxing his resume directly to Top Gun.

16

### C.  New Jersey had Personal Jurisdiction over Top Gun

We conclude that the trial court abused its discretion by vacating the New Jersey judgment.  Top Gun's contacts with the forum were sufficient for the courts of New Jersey to assert personal jurisdiction, and doing so did not offend traditional notions of fair play and substantial justice.

#### 1.  Top Gun had Minimum Contacts in New Jersey for Specific Personal Jurisdiction

Top Gun had the following contacts with New Jersey that support the exercise of specific personal jurisdiction:

- After reviewing Peters's resume, which identified him as a New Jersey resident, Top Gun sent Peters the September 5 "form email," describing the services it could provide, explaining the fee structure, and inviting Peters to call the company.

- Top Gun entered into a personal services contract that contemplated a continuing, long-term relationship for which Top Gun promised to, among other things, "[w]ork closely with [a New Jersey resident] throughout the entire process," provide executive coaching to a New Jersey resident, make phone calls to hiring managers and recruiters on behalf of a New Jersey resident, and provide weekly updates to Peters about its activities.

- Top Gun agreed to render services to Peters in connection with finding employment opportunities in New Jersey, among other states.

- Top Gun indeed found Peters an opportunity available in New Jersey, among other states.

- Top Gun sent the contract to Peters in New Jersey for his signature.

- Top Gun accepted payment from a billing address in New Jersey.

In their briefing to this court, Top Gun and Peters rely primarily on cases involving sales of goods.  Given the quality and nature of the personal services contract executed by the parties here, we find those cases overall distinguishable.  In buy-sell cases, facts concerning the nonresident's contacts with the forum before

17

executing the transaction are of paramount importance because once the transaction has been executed, the parties usually go their separate ways, and "[e]verything [the defendant] wanted out of the contract it ha[s] in hand." *See Michiana*, 168 S.W.3d at 787. Such cases do not typically show "'continuing relationships and obligations with citizens of another state.'" *See id.* at 784 (quoting *Burger King*, 471 U.S. at 473); *see also McKesson Corp. v. Hackensack Med. Imaging*, 962 A.2d 1076, 1079–80, 1086 (N.J. 2009) (minimum contacts would not be satisfied for "the casual or occasional purchaser of out-of-state products").

Thus, issues of "who initiated contact" and the frequency of solicitations are particularly important for determining whether the defendant purposefully availed itself of the forum in a buy-sell case. *Compare Michiana*, 168 S.W.3d at 784 (no personal jurisdiction when the sale was initiated entirely by the resident-buyer who made a phone call to the nonresident-seller), *and Riverside Exports, Inc. v. B.R. Crane & Equip., LLC*, 362 S.W.3d 649, 655–56 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (no personal jurisdiction when the resident-buyer "initiate[d] the purchase of equipment outside Texas by contacting a company outside Texas that does not direct marketing to Texas"), *with Lebel*, 558 A.2d at 1253 (finding personal jurisdiction when the parties met at a boat show outside the forum, and the nonresident-seller made over twenty phone calls of solicitation to the resident-buyer over a period of two years and sent the contract to the buyer in the forum).

These types of contacts, although certainly relevant, are less influential on the analysis when the parties have a course of dealing or anticipate a long-term commercial relationship involving multiple contacts. *See H. Heller & Co.*, 209 S.W.3d at 852 (finding personal jurisdiction even though the resident-buyer initiated contact with the nonresident-seller because the transaction involved

multiple sales between the parties, and the seller arranged and paid for shipment to the forum); *see also McKesson*, 962 A.2d at 1079–80, 1086 (finding personal jurisdiction because the nonresident-buyer intended to create a "long-term commercial relationship" with a resident of the forum, made nine purchases over eight months, sent a credit card application to the forum, and sent two dishonored payments to the forum).

Similarly, when a single contract evidences that the parties sought to establish a long-term arrangement with "continuing relationship and obligations," it is likely that the nonresident purposefully availed itself of the forum. *See Burger King*, 471 U.S. at 473. As the *Michiana* court acknowledged, a single contract can give rise to personal jurisdiction when the contract "involves many contacts over a long period of time." 168 S.W.3d at 787. Thus, the United States Supreme Court has found minimum contacts when the parties signed a twenty-year franchise agreement or a life insurance policy. *Id.* (citing *Burger King*, 471 U.S. at 480; *McGee*, 355 U.S. at 223).

This court found that a Nevada attorney established minimum contacts with his clients in Texas even though the clients had "solicited [the attorney] to represent them and file suit in Nevada" through a third party, a Houston attorney. *Cartlidge v. Hernandez*, 9 S.W.3d 341, 344 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The Nevada attorney sent four documents to the clients in Texas that constituted offers to provide legal representation; the clients signed the documents in Texas and returned them to Nevada. *Id.* Although the attorney had other contacts with Texas unrelated to the clients' claims, it was undisputed that the attorney did not perform any of his obligations under the contracts in Texas. *Id.* at 344–45. But the attorney repeatedly sent progress reports to update the clients about litigation that the attorney had brought in Nevada on their behalf. *Id.*

19

at 348. Further, the representation agreements did not limit the scope of representation only to the State of Nevada. *Id.* at 344.[9]

Like the attorney in *Cartilidge*, Top Gun performed all of its services for the client remotely from its place of business outside the forum. Top Gun also sent a contract to the forum and promised to work closely with Peters, provide weekly updates about the status of the work that it was doing for him, and respond to Peters's emails and telephone calls promptly. And like the representation agreement in *Cartlidge*, the contract here did not limit the scope of their relationship to finding employment opportunities in any particular state.[10] Top Gun ultimately found twenty-eight opportunities for Peters in various states, including New Jersey.

Further, the services agreement evidenced an anticipated relationship among the parties of an indefinite amount of time: "until Client is successfully placed; or, until such time this Agreement is deemed null and void." A clause required Peters to wait six months to terminate the agreement if Top Gun failed to present four

---

[9] In *Weldon-Francke v. Fisher*, this court noted that the Texas Supreme Court in *Michiana* expressly disapproved of a decision cited in *Cartlidge*. *Weldon-Francke v. Fisher*, 237 S.W.3d 789, 797 n.1 (Tex. App.—Houston [14th Dist.] no pet.). Specifically, *Michiana* "disapprove[d] of those opinions holding that . . . specific jurisdiction is necessarily established by allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number." *Michiana*, 168 S.W.3d at 791–92 & n.81 (citing *Mem'l Hosp. Sys. v. Fisher Ins. Agency*, 835 S.W.2d 645, 650–51 (Tex. App.—Houston [14th Dist.] 1992, no writ)). We are not faced with such meager facts here. Further, *Weldon-Francke* did not expressly overrule *Cartlidge*, noting that the Nevada attorney in *Cartlidge* "had more contacts with Texas than do the Lawyers in this case." *Weldon-Francke*, 273 S.W.3d at 797 n.2.

[10] *Cf. Bryan v. Gordon*, No. 14-12-00040-CV, — S.W.3d —, 2012 WL 5333372, at *9 (Tex. App.—Houston [14th Dist.] Oct. 30, 2012, no pet. h.) (no personal jurisdiction in Texas when listing agreement concerned a one-time Oregon real estate transaction); *Jackson v. Hoffman*, 312 S.W.3d 146, 155–56 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (no personal jurisdiction in Texas when the contract was for restoration of a vehicle located in Missouri); *Weldon-Francke*, 237 S.W.3d 789 at 796–97 (no personal jurisdiction in Texas when attorney's representation was limited to New Hampshire property).

suitable positions. And the contract allowed Peters the option to defer payment of the second fee for up to three years if he agreed to make referrals to Top Gun— five referrals would have been necessary to satisfy this provision. The scope and duration of the agreement suggests Top Gun purposefully availed itself of the privileges of conducting activities in the forum and could reasonably expect to be haled into court there. *See McGee*, 355 U.S. 220 (personal jurisdiction based on a life insurance contract that ultimately lasted about two years), *rev'g* 288 S.W.2d 579 (Tex. Civ. App.—Galveston 1956, writ ref'd n.r.e.); *McKesson Corp.*, 962 A.2d at 1079–80, 1086 (personal jurisdiction based on a commercial sales relationship consisting of nine purchases within eight months); *H. Heller & Co.*, 209 S.W.3d at 852 (personal jurisdiction based on a commercial sales relationship consisting of three purchases within a year). The services agreement here is simply not comparable to the type of "single sale" contract in *Michiana*.

Top Gun indeed "reached out" to New Jersey by emailing Peters after reviewing his resume, which listed his New Jersey address and lengthy employment history in New Jersey, and inviting Peters to call Top Gun and engage its services. Top Gun also sent the contract to New Jersey for Peters's signature and accepted payment of $4,500 from a New Jersey billing address. The contract itself shows that Top Gun sought to establish a continuing relationship with obligations owing to a New Jersey resident that would involve many contacts over a significant period of time.[11]

---

[11] We also note that the contract lacked a forum selection or choice of law clause, which suggests that Top Gun did not structure the transaction to avoid being haled into court in New Jersey. *See Michiana*, 168 S.W.3d at 792–93 (insertion or deletion of forum selection clause is some evidence of whether local or foreign jurisdiction was intended); *H. Heller & Co.*, 209 S.W.3d at 852 (finding personal jurisdiction and distinguishing *Michiana* in part because of the lack of a choice of law provision in the sales contract).

We conclude that Top Gun sought a benefit, advantage, or profit by availing itself of New Jersey, and its contacts with the forum were purposeful and not the result of Peters's unilateral activity. Top Gun failed to establish by clear and convincing evidence that it lacked minimum contacts with New Jersey.[12]

Peters's first issue is sustained.

## 2.  Jurisdiction in New Jersey Comported with Traditional Notions of Fair Play and Substantial Justice

Top Gun failed to meet its burden to establish that the assertion of personal jurisdiction in New Jersey would have offended traditional notions of fair play and substantial justice.

Regarding the burden for Top Gun to litigate in New Jersey, Top Gun presented evidence that it had no offices outside Texas. But Chrest acknowledged that Top Gun sent its "form email" to anyone who sent a resume to Top Gun, either directly or through third-party "resume blasters," and that Top Gun received 500 to 1,000 resumes per day in 2008. Top Gun also conducted a nationwide job search for Peters.[13] Because Top Gun apparently conducted business across state lines routinely, this factor weighs only slightly against jurisdiction in New Jersey. *See H. Heller & Co.*, 209 S.W.3d at 854.[14]

---

[12] Top Gun argues that its website was passive, and personal jurisdiction should not be based on its website. Peters does not argue that Top Gun's website in particular supports New Jersey's exercise of personal jurisdiction, and the record evidence concerning Top Gun's website is scant. The level of interactivity of Top Gun's website does not inform our decision.

[13] Chrest testified that Top Gun gave Peters twenty-eight opportunities "from California to Florida," as well as Connecticut, New York, and New Jersey.

[14] Top Gun suggests that its "clients may be anywhere in the country and not limited to the Houston area. It would place a great financial burden on Top Gun to travel to every jurisdiction to defend itself." Top Gun argues essentially that it should be amenable to suit only in Texas. Our holding today, however, is appropriately limited to the facts of this case. We do not hold that Top Gun is amenable to suit in every state arising out of every contract made with a nonresident of Texas. We hold only that Top Gun was subject to specific personal jurisdiction in

22

Further, Peters also had an interest in obtaining convenient and effective relief in New Jersey; and New Jersey has a manifest interest in protecting its citizens from injuries caused by nonresidents. *See, e.g.*, *McGee*, 355 U.S. at 223; *H. Heller & Co.*, 209 S.W.3d at 854. New Jersey also has "a legitimate interest in carrying out its own law." *Lebel*, 558 A.2d at 1258.[15]

Finally, Top Gun alleges that the two factors concerning the interstate judicial system's efficient resolution of controversies, and the shared interest of the States in furthering fundamental substantive social policies, "are likewise not called into play." But Top Gun fails to identify any compelling consideration for why jurisdiction would be unreasonable in New Jersey, and none are evident from the record. *See Guardian Royal*, 815 S.W.2d at 231; *H. Heller & Co.*, 209 S.W.3d at 855. If anything, these factors weigh in favor of upholding New Jersey's assertion of jurisdiction when litigated in a post-judgment enforcement action. *See McGee*, 355 U.S. at 224 (despite the inconvenience for the nonresident to defend in California where it had only one customer, there was no denial of due process to enforce a California default judgment in a Texas court; "There is no contention that respondent did not have adequate notice of the suit or sufficient time to prepare its defenses and appear.").

Accordingly, Top Gun failed to meet its burden on this prong of the personal jurisdiction inquiry. Peters's second issue is sustained.

## CONCLUSION

Having concluded that the trial court erred by vacating the New Jersey judgment, we reverse the trial court's order and render that the judgment Peters filed, number VJ-005161-10, entered in the Superior Court of New Jersey Law

New Jersey for claims related to these particular contacts with New Jersey.

[15] Peters's suit was based in part on Top Gun's violation of a New Jersey statute.

Division, Morris County Special Civil Part, on July 6, 2010, in docket number DC-014124-09, is presently enforceable as a Texas judgment.

/s/       Sharon McCally
Justice

Panel consists of Justices Boyce, Jamison, and McCally.