IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-81

No. 181A21

Filed 17 June 2022

TOSHIBA GLOBAL COMMERCE SOLUTIONS, INC.

v.

SMART & FINAL STORES LLC

Appeal pursuant to N.C.G.S. § 7A-27(a)(3) from an order and opinion denying defendant's motion to dismiss for lack of personal jurisdiction entered on 23 December 2020 by Judge Adam M. Conrad, Special Superior Court Judge for Complex Business Cases, in Superior Court, Durham County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 21 March 2022.

> *Robinson, Bradshaw & Hinson, P.A., by Erik R. Zimmerman, Edward F. Hennessey IV, Matthew W. Sawchak, and Benjamin C. DeCelle; and Kenneth B. Hammer, for plaintiff-appellee.*
>
> *Ellis & Winters LLP, by Paul K. Sun Jr. and Kelly Margolis Dagger, for defendant-appellant.*

BARRINGER, Justice.

¶ 1    In this matter, we must consider whether the trial court erred by denying a nonresident defendant's motion to dismiss for lack of personal jurisdiction. Plaintiff Toshiba Global Commerce Solutions, Inc. (Toshiba) is based in Durham, North Carolina, and brought this action against Smart & Final Stores LLC (Smart & Final)

for breach of contract and related claims. Smart & Final, a California company that operated warehouse-style grocery stores in the western United States, contacted Toshiba during its search for a service provider to maintain and repair the point-of-sale equipment that Smart & Final uses at its stores. In March 2019, negotiations between the parties resulted in the Master Maintenance Services Agreement (Services Agreement), in which Toshiba agreed to provide maintenance and repair services for point-of-sale equipment at all Smart & Final stores for three years. According to the complaint, Smart & Final refused to pay overage fees as required by the Services Agreement and terminated the Services Agreement without cause in April 2020. As addressed in more detail herein, on the record before us and claims alleged, the Due Process Clause of the Fourteenth Amendment does not preclude the courts of this State from entering a judgment binding on Smart & Final. Therefore, we conclude that the trial court did not err by denying Smart & Final's motion to dismiss for lack of personal jurisdiction.

## I.    Personal Jurisdiction

"The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Specifically, "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum

with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (cleaned up).

¶ 3        As articulated in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), a defendant who is not subject to general jurisdiction in a forum state or present in the forum state must "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316 (cleaned up). This jurisdiction—known as specific jurisdiction—"exists when the cause of action arises from or is related to defendant's contacts with the forum." *Skinner v. Preferred Credit*, 361 N.C. 114, 122 (2006). The relationship with the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum [s]tate." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475). While the quality and nature of defendant's activity with the forum state may vary, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Thus, consistent with the foregoing, the Supreme Court of the United States has recognized that jurisdiction exists without offending the Due Process Clause when "the suit was based on a contract which had substantial connection with that [s]tate." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).

## II. Analysis

Toshiba initiated this action against Smart & Final in Superior Court, Durham County, North Carolina, alleging breach of the Services Agreement and related claims. Smart & Final moved to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure. Both parties submitted affidavits and exhibits in support of and opposition to Smart & Final's motion, and a hearing was held, but testimony was not taken at the hearing.

In this context, when the parties have submitted affidavits and exhibits but no evidentiary hearing is held, the trial court must determine the weight and sufficiency of the evidence before it. *See* N.C.G.S. § 1A-1, Rule 43(e) (2021); *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694 (2005). However, pursuant to Rule 52(a)(2) of the North Carolina Rules of Civil Procedure, the trial court need not make specific findings of fact in support of its order unless requested by a party. N.C.G.S. § 1A-1, Rule 52(a)(2) (2021). If in deciding the motion the trial court makes findings of fact, they are conclusive on appeal when unchallenged or supported by competent evidence even when there is a conflict in the evidence. *See, e.g., Morse v. Curtis*, 276 N.C. 371, 378 (1970) ("We recognize the often-repeated rule that findings of fact by a trial judge are conclusive when supported by competent evidence, even when there is [a] conflict in the evidence, but an exception to a finding of fact not supported by competent evidence must be sustained."); *Fungaroli v. Fungaroli*, 51

N.C. App. 363, 367 (1981) (applying this rule to the Court of Appeals' review of a trial court's order denying a motion to dismiss for lack of personal jurisdiction).

¶ 6        In this matter, the trial court found facts and ultimately determined that the Services Agreement had "a substantial connection with North Carolina."[1] Although Smart & Final makes arguments concerning the competency of evidence supporting some portions of the trial court's findings, Smart & Final has not challenged the following findings of fact[2]:

> 4.    Based in Durham, North Carolina, Toshiba makes and sells point-of-sale products used by retailers— for example, scanners, monitors, and related checkout devices. It also offers support services for its products and those made by others.
>
> 5.    Smart & Final is a California company that operates a chain of warehouse-style grocery stores in the western United States. Until recently, one of its subsidiaries operated restaurant supply and wholesale food stores in the same region.
>
> 6.    In late 2017, Smart & Final began searching for a service provider to maintain and repair point-of-sale equipment at its stores. One of the vendors it contacted was Toshiba. The parties promptly signed a nondisclosure

---

[1] Since Smart & Final does not advance an argument on appeal concerning North Carolina's long-arm statute, N.C.G.S. § 1-75.4 (2021), we do not address the long-arm statute herein.

[2] The trial court listed some of the following findings of fact under the subheading "Conclusions of Law." However, this Court can and should disregard the trial court's labels when necessary to apply the appropriate standard of review. *In re M.C.*, 374 N.C. 882, 890 (2020). Therefore, to properly review the issue before us, we have listed the trial court's unchallenged findings of fact even if they appear in the paragraphs following the subheading "Conclusions of Law." Further, for readability, the trial court's citations to the record and caselaw have been omitted.

agreement, notable only because it lists Toshiba's North Carolina address at the top. Over the next few months, Toshiba sent pitch materials and a formal proposal for a mix of products and services. Toshiba touted its technology (hardware and software), national presence (a fleet of technician vans coupled with a network of stocking locations to house inventory), and support infrastructure (a central repair depot and an "expert staff of trained personnel . . . at our corporate HQ" in North Carolina). Ultimately, though, Smart & Final went with a different vendor.

7.    Evidently, that relationship didn't work out, and soon Smart & Final was looking for a new vendor. It reached out to Toshiba a second time and requested another proposal. Most of the negotiations took place via e-mail and telephone between Smart & Final representatives in California and Toshiba representatives in California and Texas. There was also at least one in-person meeting at Smart & Final's California headquarters.

8.    This time, the negotiations were fruitful, producing a services agreement in March 2019. In a nutshell, Toshiba agreed to provide maintenance and repair services for point-of-sale equipment at all Smart & Final stores for three years. Smart & Final could renew the agreement for additional one-year terms with written notice to Toshiba's North Carolina headquarters. A choice-of-law provision states that New York law governs the agreement.

9.    Smart & Final selected two service options: "On-Site Repair" and "Advanced Exchange Plus." On-Site Repair means just what it says: a Toshiba technician would travel to a given store and try to repair defective equipment on site. Advanced Exchange Plus, on the other hand, is a replacement service. This option calls for the technician to replace the defective part with a working unit taken from inventory called seed stock. Although Smart & Final could have chosen to own and maintain the seed stock itself, it

shifted that burden to Toshiba. Toshiba also took responsibility for installing replacement parts and for "the return of the [defective] Product back to [its] depot."

10. Both service options are geared toward addressing problems as they arise. Determined "to operate [its] stores without interruption," Smart & Final put a premium on speed. The agreement specifies response times and performance goals typically based on same-day or next-day service. Along with making its technicians available seven days a week, Toshiba agreed to "provide an infrastructure and support structure to meet" its obligations.

11. These requirements are reflected in the price. Attachment A details the prices for repair and replacement services for dozens of products, based in part on estimates of the amount of seed stock needed, the expected response time, and the number of anticipated service calls. It also states various pricing assumptions, including that Toshiba would own the seed stock and "image/configure units during the receive and repair process at our Depot." For the Advanced Exchange Plus option, the price sheet assumes that a "technician will meet [the] part on-site that is shipped from the Toshiba depot," noting that the replacement "part for [a] failed unit [would be] available under Next Business Day support."

12. Although the agreement doesn't say so, the "depot" is part of Toshiba's "Tricenter operations hub" in North Carolina. This is where Toshiba managed the seed stock and repaired failed equipment throughout its relationship with Smart & Final. Before the "go live date" for the services agreement, employees at the depot estimated the seed stock needed to get started, procured it (because Smart & Final used non-Toshiba equipment), and then shipped it to field technicians and stocking locations. As time went by, the depot received and repaired equipment that technicians could not fix on site. The depot then returned these repaired items to the seed stock or, if

a part was beyond repair, replenished the stock with new equipment.

13. Over the course of their relationship, Toshiba handled about 7,200 repair tickets for Smart & Final. Some involved purely on-site repairs. Many others required support from Toshiba's depot in North Carolina. The depot recorded more than 4,200 shipments of parts to replenish inventory and more than 2,600 repairs for parts removed from Smart & Final stores—about seven percent of the repairs and replenishments performed for all Toshiba customers.

14. Less than a year into their relationship, the parties split. Toshiba alleges that the equipment covered by the agreement failed at rates far higher than Smart & Final predicted during negotiations, triggering hefty overage fees. As alleged, Smart & Final refused to pay and then terminated the agreement without cause in April 2020, more than two years before its scheduled expiration. Toshiba sued for breach of contract and related claims.

. . . .

26. . . . Smart & Final initiated contact with a resident of this State and created a continuing relationship involving services that were performed both within and outside North Carolina.

. . . .

29. Smart & Final was well aware when it contacted representatives of Toshiba that it was soliciting business from a North Carolina-based entity. The nondisclosure agreement that preceded negotiations has Toshiba's address right at the top. . . . [T]he services agreement . . . requires all notices to go to Toshiba's Durham headquarters. Furthermore, . . . Smart & Final is a large, sophisticated company deeply familiar with the market for point-of-sale products and services. At no point has Smart

& Final claimed surprise to find that Toshiba is based in North Carolina.

. . . .

31. . . . In less than a year, Toshiba recorded thousands of shipments from its North Carolina base to maintain seed stock and replenish inventory, along with more than 2,600 repairs of parts taken from Smart & Final stores. This was not only a substantial part of the services performed for Smart & Final but also an appreciable part of the repair and replenishment services that Toshiba performed as a whole.

32. . . . Smart & Final had the option to keep its seed stock in house so that Toshiba would be responsible only for labor at affected stores. Instead, Smart & Final put the burden on Toshiba to create and maintain the seed stock and to provide the infrastructure needed for same-day and next-day services. . . .

33. . . . [I]t is undisputed that Smart & Final did not come to North Carolina or perform any services here.

. . . .

35. . . . Toshiba actually performed a substantial portion of its [contractual] obligations in the State. . . .

36. Finally, in some rare cases, it may be unreasonable or inconvenient to exercise jurisdiction even when the defendant has the requisite minimum contacts with the forum. Smart & Final has not made that argument here.

¶ 7 Since these binding findings of fact are sufficient to support personal jurisdiction over Smart & Final under this Court's and the Supreme Court of the United States' precedent for the reasons addressed herein, we need not address

Smart & Final's challenges to any other findings of fact or the arguments concerning the disputed findings of fact.

¶ 8 Further, we do not find the standard of review determinative in this matter. This Court has implicitly endorsed that whether personal jurisdiction exists is a question of fact and that appellate courts do not review de novo a trial court's determination of personal jurisdiction but assess whether the determination is supported by competent evidence in the record. *Ponder v. Been*, 275 N.C. App. 626, 636–37 (2020) (Stroud, J., dissenting), *rev'd per curiam for reasons stated in the dissent*, 380 N.C. 570, 2022-NCSC-24; *Eluhu v. Rosenhaus*, 159 N.C. App. 355, 357 (2003), *aff'd per curiam*, 358 N.C. 372 (2004). "However, when the pertinent inquiry on appeal is based on a question of law[,] . . . we conduct de novo review." *Da Silva v. WakeMed*, 375 N.C. 1, 5 (2020). Whether reviewing the finding of personal jurisdiction for competent evidence or de novo, we hold that the trial court did not err by denying the motion to dismiss for lack of personal jurisdiction because the Services Agreement had a substantial connection with this State.

¶ 9 The Supreme Court of the United States recognized over half a century ago that the Due Process Clause does not preclude a state court from entering a judgment binding on a contracting party when "the suit was based on a contract which had substantial connection with that [s]tate." *McGee*, 355 U.S. at 223. *McGee* addressed a state's personal jurisdiction over a nonresident life insurance company. *Id.* at 221.

The nonresident life insurance company had no offices or agents in the forum state and "ha[d] never solicited or done any insurance business in [the forum state] apart from the policy involved [in the case]." *Id.* at 222. The Court concluded that the forum state had jurisdiction over the nonresident life insurance company because the contract had a substantial connection with the forum state. *Id.* at 223. "The contract was delivered in [the forum state], the premiums were mailed from there and the insured was a resident of that [s]tate when he died." *Id.*

¶ 10      A few decades later, the Supreme Court of the United States in *Burger King* revisited personal jurisdiction in the context of a contractual dispute. 471 U.S. at 463–64. The Court explained that there is no mechanical test for determining jurisdiction between contracting parties; it does not turn on "the place of contracting or of performance," *id.* at 478 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316 (1943)), and "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum," *id.* at 478. Instead, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [are the factors] that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479.

¶ 11      After analyzing the facts relating to these factors, the Supreme Court of the United States in *Burger King* concluded that there was substantial record evidence

supporting the trial court's determination "that the assertion of personal jurisdiction over [the nonresident individual in the forum state] for the alleged breach of his franchise agreement did not offend due process." *Id.* at 478. Notably, the nonresident individual had "no physical ties" to the forum state; he had never visited and did not maintain offices in the forum state. *Id.* at 479. However, "th[e] franchise dispute grew directly out of 'a contract which had a *substantial* connection with that [s]tate.' " *Id.* (quoting *McGee*, 355 U.S. at 223).

¶ 12        While this case differs in some respects from *Burger King*, our analysis of the facts before us, as informed by applicable precedent, leads us to conclude that the assertion of personal jurisdiction over Smart & Final for the alleged breach of the Services Agreement and related claims does not offend due process. Specifically, as discussed below, the undisputed facts concerning the "contemplated future consequences," "terms of the contract," and "actual course of dealing" all support a determination that the Services Agreement is a contract with a substantial connection with the State of North Carolina.

¶ 13        First, Smart & Final intentionally solicited a company that it knew to be based in North Carolina and sought a service provider to maintain and repair point-of-sale equipment through that solicitation. Between late 2017 and early 2019, this solicitation occurred twice. This is substantively analogous to *Burger King* where the defendant challenging jurisdiction negotiated with an out-of-state corporation and

such negotiations were not for a one-off transaction but for a "long-term franchise." *Id.* at 479. The *Burger King* defendant "[e]schew[ed] the option of operating an independent local enterprise" and pursued a contract with "the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479–80. While the relationship between the parties in this case is not of franchisor and franchisee as in *Burger King*, Smart & Final contacted a company based in North Carolina to provide ongoing services in lieu of servicing its point-of-sale equipment itself. The sought relationship, thus, was not a one-off transaction, such as a one-time purchase of goods, but a contractual relationship sought by Smart & Final knowing that Toshiba was based in North Carolina.

¶ 14        Second, Smart & Final and Toshiba did enter into a contract, the Services Agreement, in March 2019. In that contract, Toshiba agreed to provide maintenance and repair services for point-of-sale equipment at all Smart & Final stores for three years. Smart & Final could also renew the Services Agreement for additional one-year terms by sending a written notice to Toshiba's North Carolina headquarters. Thus, the contract and relationship formed because of Smart & Final's solicitation of a company based in North Carolina was not a one-off transaction but one involving ongoing services for at least three years. While the Services Agreement does not contemplate a twenty-year relationship like in *Burger King*, it nevertheless

established a substantial relationship that was contemplated to potentially extend beyond three years.

Third, pursuant to the Services Agreement, Toshiba took responsibility for installing replacement parts on-site from inventory shipped from the Toshiba depot and for returning defective equipment back to Toshiba's depot. During the course of the parties' relationship, the depot was located in North Carolina and was where Toshiba managed and repaired the inventory. Employees at the depot in North Carolina estimated the inventory needed to fulfill its responsibilities under the Services Agreement, procured it, and shipped it to field technicians and stocking locations. Thereafter, the depot in North Carolina received and repaired defective equipment that could not be fixed on-site and returned the repaired (or new) equipment to field technicians and stocking locations. The depot in North Carolina recorded "more than 4,200 shipments of parts to replenish inventory" and "more than 2,600 repairs for parts removed from Smart & Final stores."

Fourth, the Services Agreement required that any written notice required under the Services Agreement be directed to Toshiba's office in North Carolina. As summarized by Smart & Final in its brief, Smart & Final "gave notice, addressed to Toshiba's Durham office, that it was exercising its contractual right to terminate the [Services] Agreement" on 1 April 2020. One month later, Toshiba sued for

nonpayment and contended that Smart & Final breached the Services Agreement "by terminating [it] without a contractual basis to do so."

¶ 17        Given the foregoing facts, the "contemplated future consequences" as reflected in "the terms of the contract" involved Toshiba maintaining a depot to meet its contractual obligations. *Burger King*, 471 U.S. at 479. Furthermore, "the parties' actual course of dealing" showed that Toshiba used a depot in North Carolina to meet its contractual obligations by performing a substantial number of repairs at and shipments from the depot. *Id.* On average, there were over seven repairs a day at the depot in North Carolina and over eleven shipments a day from the depot in North Carolina. The "terms of the contract" also dictated that any written notice required by the Services Agreement be sent to Toshiba's office in North Carolina, and "the parties' actual course of dealing" showed that Smart & Final sent written notice to Toshiba in North Carolina to terminate the Services Agreement. These undisputed facts concerning the "contemplated future consequences," "terms of the contract," and "actual course of dealing" all support a determination that the Services Agreement is a contract with a substantial connection with the State of North Carolina.

¶ 18        Nevertheless, Smart & Final argues that "[t]he only link between this case and North Carolina is that [Smart & Final] contracted with Toshiba, which has its corporate headquarters in North Carolina." According to Smart & Final, Smart & Final's solicitation of a North Carolina-based company does not show purposeful

availment because Smart & Final did not reach into North Carolina by sending an agent physically to North Carolina or by physically sending e-mails or letters to North Carolina. In Smart & Final's view, it merely directed contact to Toshiba, not North Carolina. Smart & Final also contends that because the Services Agreement did not require performance within North Carolina, Toshiba's conduct in North Carolina to fulfill its contractual obligations under the Services Agreement are unilateral acts and not evidence of Smart & Final's purposeful availment of the North Carolina forum.

¶ 19        The contractual negotiations between Smart & Final and Toshiba did occur outside of North Carolina, and Smart & Final did not come to or perform any services in North Carolina. Thus, Smart & Final is correct that this case does not involve contacts with North Carolina from Smart & Final's agents being physically present in North Carolina. Nevertheless, "physical presence in [North Carolina] is not a prerequisite to jurisdiction." *Walden*, 571 U.S. at 285. The defendants in both *Burger King* and *McGee* had no physical presence in the forum state. *Burger King*, 471 U.S. at 479; *McGee*, 355 U.S. at 222.

¶ 20        Additionally, the fact that contract negotiations and formation occurred outside North Carolina does not foreclose jurisdiction in this case. In *Burger King*, the defendant applied to Burger King's Birmingham, Michigan, district office for a franchise, dealt with this office daily, and ultimately executed a final agreement with

Burger King after negotiating with the district office and Burger King's headquarters in Florida. 471 U.S. at 466–67, 467 n.7. The Supreme Court of the United States rejected the Court of Appeals reasoning that given the supervision and involvement of the district office, the defendant reasonably believed that the Michigan office was "the embodiment of Burger King," and "he therefore had no reason to anticipate a Burger King suit outside of Michigan." *Id.* at 480 (cleaned up). Instead, the Supreme Court concluded that there was "substantial record evidence indicating that [the defendant] most certainly knew that he was affiliating himself with an enterprise based primarily in Florida," *id.* at 480, and determined that the assertion of personal jurisdiction over the defendant in Florida "did not offend due process," *id.* at 478.

In this matter, it is undisputed that Smart & Final solicited Toshiba agents outside of North Carolina and knew at the time that Toshiba was based in North Carolina. Like the Supreme Court of the United States, we therefore cannot dismiss Smart & Final's solicitation of Toshiba as irrelevant. Knowingly soliciting an entity based in North Carolina for a multiyear contractual relationship is relevant to whether a contract has a substantial connection with North Carolina. *See Mucha v. Wagner*, 378 N.C. 167, 2021-NCSC-82, ¶ 11 ("In prior cases where this Court has found a defendant's one-time contacts sufficient to create specific personal jurisdiction in North Carolina, the defendant knew or reasonably should have known

that by undertaking some action, the defendant was establishing a connection with the State of North Carolina.").

¶ 22    Also, nothing in *McGee*, *Burger King*, or this Court's decision applying *Burger King* in *Tom Togs, Inc. v. Ben Elias Industries Corp.*, 318 N.C. 361 (1986), suggests that unless the location of the act is dictated by the contract, performance of a contractual obligation in the forum state is an irrelevant unilateral act. In *McGee*, the Supreme Court of the United States in its analysis identified three facts supporting its determination that the suit involved a contract with a substantial connection to the forum. 355 U.S. at 223. One fact was that "the premiums were mailed from [the forum state]." *Id.* In assessing the personal jurisdiction of the forum state concerning a breach of a life insurance contract, *McGee* did not mention that the contract required the insured to mail premium payments *from* the forum state. Thus, *McGee* lends no support to defendant's contention that the contract must require performance in the forum state. Instead, *McGee* supports the notion that regular contractual performance of a contractual obligation, like premium payments, in the forum is relevant even if the location of the performance is not dictated by the contract.

¶ 23    In *Burger King*, the Supreme Court of the United States, when assessing whether there was record evidence to support that the defendant knew he was affiliating with an entity from the forum state, recognized that the contract

documents did "*emphasize* that Burger King's operations are conducted and supervised from the [forum state] headquarters." 471 U.S. at 480 (emphasis added). However, the contract in *Burger King* did not require Burger King to conduct operations from and supervise from its headquarters in the forum state. *See id.* at 488 (Stevens, J., dissenting) (identifying that the contract "required no performance in the state of Florida" and held the district office "responsible for providing all of the services due [defendant]"). Similarly, in *Tom Togs*, the nonresident defendant was "aware that the contract was going to be substantially performed in [the forum state]," but the Court's opinion never indicates that performance was required to be in the forum state. 318 N.C. at 367.

¶ 24        Finally, Smart & Final's view of the Services Agreement's connection to North Carolina is contrary to the unchallenged findings of fact as analyzed previously. This Court has recognized that "[a]lthough a contractual relationship between a North Carolina resident and an out-of-state party alone does not *automatically* establish the necessary minimum contacts with this State, nevertheless, a single contract may be a sufficient basis for the exercise of in personam jurisdiction if it has a substantial connection with this State." *Tom Togs*, 318 N.C. at 367 (second emphasis omitted). Here, the Services Agreement does have a substantial connection with North Carolina, and Smart & Final has not argued that it would be unreasonable or inconvenient for the courts of this State to exercise jurisdiction. Therefore, we hold

that the trial court did not err by denying Smart & Final's motion to dismiss for lack of personal jurisdiction.

### III.     Conclusion

The Due Process Clause does not foreclose the exercise of personal jurisdiction over Smart & Final by the courts of this State on Toshiba's breach of contract and related claims because the contract at issue has a substantial connection with this State. Smart & Final has "certain minimum contacts with [this State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (cleaned up). Accordingly, we affirm the decision of the trial court.

AFFIRMED.